[No. B181303. Second Dist., Div. Seven. Feb. 15, 2006.]

WESTERN STATES PETROLEUM ASSOCIATION, Plaintiff and Appellant, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT et al., Defendants and Respondents.

1014

**COUNSEL**

Mayer, Brown, Rowe & Maw, Gregory R. McClintock, Steven O. Kramer, Donald M. Falk and Christopher P. Murphy for Plaintiff and Appellant.

Shute Mihaly & Weinberger, Fran M. Layton, Matthew D. Zinn; Kurt R. Wiese, Barbara B. Baird and William B. Wong for Defendants and Respondents.

**OPINION**

**JOHNSON, J.**—At issue is a rule adopted by the South Coast Air Quality Management District (the District) requiring the six oil refineries in its jurisdiction to reduce their emissions of ammonia and small particulate matter (PM10) by December 31, 2006 or be subject to criminal, civil and administrative penalties and possible loss of their licenses to operate. The Western States Petroleum Association (WSPA), representing the refineries, sought a writ of mandate from the superior court vacating the rule on the grounds the District lacked substantial evidence the refineries could achieve the new standards and that the new standards were cost effective. WSPA also argued the rule should be vacated because the District had not adequately assessed the environmental impact, which would result from the refineries' attempts to comply with the rule and had failed to maintain, produce and disclose pertinent records of the rule's development. The superior court denied the writ and this timely appeal followed.

We conclude substantial evidence supports the District's findings of feasibility and cost effectiveness. We also hold the District complied with the

applicable CEQA requirements and substantial evidence supports the trial court's finding the administrative record contains all relevant documents in the District's possession.

## FACTS AND PROCEEDINGS BELOW

### A. *The Rule*

In November 2003 the District adopted rule 1105.1 giving the six refineries in its jurisdiction until December 31, 2006 to reduce the emissions of PM10 and ammonia from their fluid catalytic cracking units (FCCU's). The refineries may request an extension to December 31, 2008 to synchronize the installation of PM10 control devices with their FCCU's operational cycles. The new standards provide PM10 emissions cannot exceed 0.005 grains per dry standard cubic foot (0.005 gr/dscf) and ammonia emissions cannot exceed 10 parts per million by volume (10 ppmv). As an alternative to meeting the PM10 standard of 0.005 gr/dscf the rule allows a refinery to emit up to 0.006 gr/dscf of PM10 if it can find ways to make up the difference. The rule provides other escape clauses for refineries which are unable to meet the new standards, as discussed below.[1]

### B. *The Reason for the Rule*

An FCCU is a processing unit used in refining petroleum. The FCCU takes heavy crude oil and "cracks" it into more usable hydrocarbons. These hydrocarbons can be further refined to make gasoline and other fuels. This cracking creates fine particulate matter referred to in the industry as PM10.[2] The federal Environmental Protection Agency (EPA) has found the adverse health effects from elevated PM10 concentrations include lung damage, respiratory and cardiovascular disease and premature death. Children, the elderly and people suffering from heart and lung diseases such as asthma are particularly at risk.[3]

In order to try to trap PM10 before it can escape into the environment FCCU's are equipped with electrostatic precipitators (ESP's). An ESP electrically charges the particles which are then attracted to large collection plates which are oppositely charged. The particles are removed from the plates in one of two ways. A "dry" ESP uses a mechanical hammering device, which dislodges the particles. A "wet" ESP uses water to continuously wash down

---

[1] See discussion at page 1021, *post*.

[2] PM10 is particulate matter 10 microns or smaller. Ten microns is approximately 1/7th the thickness of a human hair.

[3] See 70 Federal Register 43664 (July 28, 2005).

the plates. No ESP is 100 percent efficient in trapping PM10 so some particulate matter inevitably escapes into the environment.

In order to enhance an ESP's ability to trap PM10's refineries sometimes use ammonia as an agent to reduce the particles' resistance to electrical charge. The problem with this technique is that it creates "ammonia slip"—unreacted ammonia, which is emitted into the atmosphere where it reacts with other gases to produce fine chemical particulates such as ammonia sulfates, which can cause conjunctivitis, laryngitis and pulmonary edema especially in persons suffering from asthma.

The EPA has established nationwide standards for PM10 emissions[4] and has found the Southern California Basin to be "serious[ly]" out of conformity with those standards.[5] Accordingly the EPA has given California a deadline of December 31, 2006 to bring PM10 emissions into compliance with federal standards. Failure to do so could ultimately subject the state to severe penalties such as the withholding of billions of dollars in federal highway funds.[6]

Although FCCU's are not the only source of PM10 emissions they are the single largest regulated stationary source of PM10 pollution in the Southern California Basin emitting approximately 318 tons of PM10 into the atmosphere each year. Thus it was inevitable the District would seek to reduce these emissions as part of its strategy to bring the basin into conformity with federal PM10 standards.

C. *Development of Rule 1105.1*

The District's staff first proposed a rule limiting PM10 in 1989 but other priorities intervened until 1995 when agency staff and refinery operators formed a task force to study FCCU emissions and potential control strategies. The task force conducted source tests at the six refineries under the District's jurisdiction. Summarizing the results of these tests the District's staff noted the refinery with the newest ESP technology "got little actual PM reduction and still emits significant amounts of [ammonia]." In fact the tests showed as PM10 emissions were reduced ammonia emissions increased. The staff recommended any further development of the rule include limits on ammonia emissions.

Further development of the rule was postponed until 2002 when the District's staff formed a working group with representatives of the refineries

---

[4] 62 Federal Register 38652, 38656, 38665 (July 18, 1997).

[5] 58 Federal Register 3334 (Jan. 8, 1993).

[6] Title 42 United States Code section 7509; 59 Federal Register 39832–39845 (Aug. 4, 1994).

and WSPA to consider appropriate limits on PM10 and ammonia emissions. Representatives of environmental organizations were also invited to participate.

After consultation with the members of the working group the District's staff proposed a rule calling for emission limits of 0.0042 gr/dscf for PM10 and 10 ppmv for ammonia. The staff based these limits on "the current emission level at Refinery A," which had the newest ESP among the six refineries.[7]

WSPA objected to the proposed rule on the ground refinery A had characteristics not found or reproducible at other refineries. Moreover, WSPA contended, even with its new equipment, refinery A had not been able to achieve a 0.0042 emission level on a consistent (five-year) basis. An expert engaged by WSPA concluded the lowest feasible emission rate of PM10 would be 0.006 gr/dscf regardless of how little or how much ammonia the refinery used in its ESP. The District's own expert disputed the conclusions of WSPA's expert. He concluded the proposed limits on PM10 and ammonia emissions were technologically feasible and sustainable. Nevertheless this expert recommended increasing the PM10 limit to 0.005 gr/dscf to account for space constraints at some of the refineries, which could affect their ability to install the equipment necessary to meet the proposed limit of 0.0042 gr/dscf.

Prior to submitting the proposed rule to the District's board for approval the staff prepared and publicly circulated an environmental assessment which acknowledged that even with mitigating measures the construction of the new or modified ESP's needed to comply with the proposed rule could cause significant short-term impacts on air quality. Despite this adverse environmental impact the staff recommended adoption of the proposed rule because its long-term benefits outweighed its short-term detriments.

At a public hearing the District's board heard presentations by its staff and representatives of WSPA along with testimony from a refinery representative and members of the public. Following the hearing the board voted to adopt the environmental assessment and the proposed rule.

D.   *WSPA's Petition for Writ of Mandate*

WSPA filed suit in the Superior Court of Los Angeles County challenging the legality of rule 1105.1. The suit seeks a writ of mandate under Code of

---

[7] The six affected refineries are referred to by letter in the briefs and administrative record in order to protect information the refineries consider confidential.

Civil Procedure section 1085[8] and injunctive and declaratory relief on the grounds the rule is arbitrary, capricious and an abuse of discretion, lacks adequate evidentiary support and was adopted without adherence to proper administrative procedures. In particular, the complaint alleges rule 1105.1 establishes emission limits for PM10, which are neither feasible nor cost effective, and was adopted without proper adherence to the requirements of the California Environmental Quality Act (CEQA).[9] Prior to a hearing on the writ petition WSPA moved for an order requiring the District to correct the administrative record to include all documents created prior to 2002 addressing the feasibility and cost-effectiveness of proposed rule 1105.1.

The trial court denied the motion to correct the record and denied the writ. WSPA filed a timely appeal from the judgment.

## DISCUSSION

### I. *STANDARD OF REVIEW*

The parties agree the District's adoption of rule 1105.1 was a quasi-legislative action. As such the authority of the trial court "is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair."[10] This limited judicial review is further constrained by the recognition that "[i]n technical matters requiring the assistance of experts and the study of marshaled scientific data as reflected herein, courts will permit administrative agencies to work out their problems with as little judicial interference as possible."[11]

We review the trial court's decision de novo under the same standard.[12]

---

[8] Code of Civil Procedure section 1085, subdivision (a) states: "A writ of mandate may be issued by any court to an inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by such inferior tribunal, corporation, board, or person."

[9] Public Resources Code section 21000 et sequitur.

[10] *Fullerton Joint High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168], quoted in *Sherwin-Williams Co. v. South Coast Air Quality Management Dist.* (2001) 86 Cal.App.4th 1258, 1267 [104 Cal.Rptr.2d 288].

[11] *Stauffer Chemical Co. v. Air Resources Board* (1982) 128 Cal.App.3d 789, 795 [180 Cal.Rptr. 550].

[12] *Sherwin-Williams Co. v. South Coast Air Quality Management Dist.*, *supra*, 86 Cal.App.4th at page 1267. The District has informed us that while this appeal was pending the EPA approved rule 1105.1. We have not taken the EPA's approval into consideration in deciding the appeal because it is irrelevant to the issues before us.

II.  *SUBSTANTIAL EVIDENCE SUPPORTS THE DISTRICT'S DETERMINATION THE LIMIT ON PM10 EMISSIONS IN RULE 1105.1 IS ACHIEVABLE BY THE REFINERIES*

The experts consulted by the District and WSPA agreed that given the right circumstances a reduction of PM10 emissions to 0.005 gr/dscf is achievable with existing technology.[13] The issues before the District's board were what are the "right circumstances" and whether they exist or can they be created at the six affected refineries.

WSPA's own experts on ESP design and operation testified the most important factors in trapping PM10 emissions are the size of the unit, the amount of heat inside the unit and the amount of redundancy built into the unit.[14]

The District relied on a variety of evidence showing the affected refineries could design and build ESP's which were big enough, hot enough and had enough redundancy to achieve the PM10 and ammonia limits contained in rule 1105.1.[15] We summarize below this evidence and the "escape routes" built into the rule.

A.  *Refinery A*

The principal evidence supporting the rule consisted of test results from refinery A, one of the six affected refineries, which showed during the period 1993 to 1997 the refinery consistently met or bettered the rule's requirements as to PM10 and ammonia emissions.[16] Refinery A was retested in 2003 and again met both the PM10 and ammonia standards.

WSPA contends refinery A's achievements are not a fair indication the other refineries can meet the standards prescribed by rule 1105.1.

Because of the configuration of refinery A's FCCU its emissions were tested before they passed through a "CO boiler," which produces additional PM10. The evidence showed, however, one of the other refineries also has its

---

[13] Thus, we need not address the question whether or to what extent the District has the statutory authority to adopt "technology-forcing" rules. (See *Dunn-Edwards Corp. v. South Coast Air Quality Management Dist.* (1993) 19 Cal.App.4th 536, 540 [24 Cal.Rptr.2d 99]; D. Bruce La Pierre, Technology-Forcing and Federal Environmental Protection Statutes (1977) 62 Iowa L.Rev. 771.)

[14] Redundancy in this context means a backup system to trap PM10 while the ESP is partially or wholly off-line for maintenance or repair.

[15] WSPA does not challenge the limit on ammonia emission.

[16] The District views consistency as the ability to achieve and maintain the emission limits throughout the FCCU's five-year operational cycle.

CO boiler downstream of its ESP. There is nothing in the District's rules to prevent a refinery from placing its CO boiler downstream or eliminating the CO boiler altogether.

WSPA also contends the other refineries do not have sufficient space available to duplicate the size of refinery A's ESP. WSPA cites no evidence to back up this contention. A consultant hired by the District reached the opposite conclusion based on its site visits to each of the refineries.

WSPA next contends refinery A's lower PM10 emissions were not solely the result of installing a new ESP in 1993 but were due in part to other changes in the refinery's system which impacted FCCU emissions. The record contains no evidence, however, to support WSPA's conclusion the "other changes" made at the same time the new ESP was installed helped reduce the refinery A's PM10 emissions.[17] Even assuming such a correlation exists, WSPA produced no evidence the other refineries could not make the same changes refinery A made or that the cost of these changes would be prohibitive.

Finally, WSPA states refinery A operates "a more efficient hot ESP while other refineries' configurations require that they use less efficient *cold* ESP's." (Italics added.) Again WSPA cites no evidence in the record to support the quoted statement. What the record does show is that ESP's typically operate at a temperature of 500 to 700 degrees and that ESP's can be designed for all six refineries to operate at those temperatures.

As to redundancy, the District's consultant concluded ESP's could be designed and installed at the affected refineries to meet the requirements of rule 1105.1 with 25 percent of their ESP's out of service. Although WSPA's expert disputed this conclusion, it was up to the District's board to decide which expert's opinion to accept.

B. *Evaluations by ESP Manufacturers*

The District staff consulted with several ESP manufacturers in determining whether the proposed rule was feasible. While all the manufacturers hedged and qualified their responses, none stated the rule's requirements could not be met. For example, McGill AirClean Corporation stated its dry ESP's "have shown they can achieve the outer level of 0.005 gr/scf(d) on FCC units" and Southern Environmental Corporation stated it could "guarantee" a PM10 emission standard of 0.005 gr/dscf using a dry ESP unit so long as there was enough room to install the unit and the ESP could use some ammonia injection.

---

[17] The logical fallacy of *post hoc ergo propter hoc* assumes one event is the cause of another merely because the first event precedes the other.

C. *Evaluation by ESP Consultant*

The six affected refineries were evaluated by James Campbell, a consultant with many years experience in working with ESP's. After making site visits to each refinery Campbell concluded a PM10 limit of 0.0042 gr/dscf was "technically feasible with the use of dry [ESP's] and without any ammonia conditioning." Campbell also concluded, however, three of the refineries would have difficulty meeting this standard on a consistent basis because of space limitations affecting redundancy. For this reason Campbell recommended, and the board adopted, a higher emission limit of 0.005 gr/dscf with 10 ppmv of ammonia slip.

D. *Alternatives to Complying with the Rule's Emission Standards*

The availability of three "escape routes" from the rule's emission standards further convinces us the board acted reasonably in adopting the rule.

Rule 1105.1 requires each refinery to comply with the PM10 and ammonia limits by December 31, 2006. Refineries, however, may request an extension up to December 31, 2008 in order to synchronize the installation of PM10 control devices with their normal FCCU turnaround times.

A refinery which finds it cannot meet the PM10 emissions standard of 0.005 gr/dscf is permitted to emit PM10 not to exceed 0.006 gr/dscf so long as the 0.001 gr/dscf difference is mitigated by alternative control measures.[18]

Finally, recognizing there were arguments against the rule's feasibility by respectable industry sources, the District staff promised at the public hearing on the rule it would monitor the refineries' progress in meeting the rule, report back to the board, and make adjustments in the rule if adjustments are necessary.

These alternatives appear to address WSPA's concerns other refineries may not be able to duplicate the emissions of refinery A.

For the reasons discussed above we conclude the record contains substantial evidence the refineries will be able to comply with rule 1105.1.

### III. *THE DISTRICT PROPERLY DETERMINED THE COST EFFECTIVENESS OF RULE 1105.1*

■ Before the District can adopt a new regulation which "will significantly affect . . . emissions limitations" the District must, to the extent data is

---

[18] Rules which permit a plant to find alternative ways of meeting a pollution standard are generally favored by industry. (See Landau, *Chevron, USA v. NRDC: The Supreme Court Declines to Burst EPA's Bubble Concept* (1985) 15 Envtl. L. 285, 295–302.)

available, "perform an assessment of the socioeconomic impacts of the adoption . . . of the rule or regulation."[19] The socioeconomic impact of an emission limitation includes "[t]he range of probable costs, including costs to industry, of the rule or regulation"[20] and "[t]he availability and cost-effectiveness of alternatives to the rule or regulation, as determined pursuant to [Health and Safety Code] section 40922."[21] In adopting a regulation the District must consider and make available to the public its findings related to the cost effectiveness of a control measure determined pursuant to Health and Safety Code section 40922 "as well as the basis for the findings and the considerations involved."[22] Furthermore, the District "shall make reasonable efforts, to the extent feasible within existing budget constraints, to make specific reference to the direct costs expected to be incurred by regulated parties, including businesses and individuals."[23]

The record shows the total cost of installing new ESP's at the five refineries that currently do not meet the 0.005 gr/dscf standard will be in the range of $88 million to $100 million. Based on these figures the District staff estimated the cost effectiveness of the rule to be between $3000 and $5000 per ton of PM10 and ammonia reduced.

WSPA argues the District failed to properly evaluate the costs of the proposed rule because it ignored WSPA's site-specific data and used generic equipment cost indexes instead. The record refutes this claim. It shows the District's consultant, SP Environmental, visited each of the six refineries to review the costs associated with rule 1105.1. Each visit included a session reviewing the basis of each refinery's cost estimates for the proposed rule and obtaining additional information regarding site-specific conditions and space availability. The consultant walked each site to assess the options available. Based upon the information obtained during these site visits the consultant prepared independent cost estimates for each refinery.[24]

WSPA also contends the District violated the requirement it consider "[t]he availability and cost-effectiveness of alternatives to the [proposed] rule or

---

[19] Health and Safety Code section 40440.8, subdivision (a).

[20] Health and Safety Code section 40440.8, subdivision (b)(3).

[21] Health and Safety Code section 40440.8, subdivision (b)(4). A determination "pursuant to [Health and Safety Code] section 40922" requires the District to assess "the cost effectiveness of available and proposed control measures" and to make a list "which ranks the control measures from the least cost-effective to the most cost-effective." Health and Safety Code section 40922, subdivision (a).

[22] Health and Safety Code section 40703.

[23] Health and Safety Code section 40703.

[24] The cost estimate for each refinery was not made part of the public record at the request of the refineries.

regulation"[25] by failing to consider an alternative rule proposed by WSPA, which would have limited PM10 emissions to 0.008 gr/dscf instead of the 0.005 gr/dscf limit contained in rule 1105.1. Again the record rebuts this claim. District staff advised WSPA it had conducted "an incremental cost analysis that indicates that the incremental cost effectiveness of between 0.008 gr/dscf and 0.005 gr/dscf is only $12,000 per additional ton of reductions, which is very cost effective." In addition WSPA's 0.008 proposal was discussed at length at the public hearing on the 0.005 standard. WSPA's representatives presented and explained their proposal to the District board and responded to the board's questions.

■ Finally WSPA maintains the vendors who supplied the District staff with cost estimates were inexperienced in building ESP's and the District's consultant was incompetent to evaluate the costs of complying with the proposed rule. The District board, however, was aware of the qualifications of the consultants used by its staff and by WSPA. It chose to rely on the consultants chosen by its staff. As our Supreme Court has noted, "The choice between conflicting expert analysis is for the [board], not the courts."[26] We find nothing in the record which would allow us to say the choice in this case was unreasonable, especially when we consider WSPA's experts were unable to say their 0.008 standard was any more feasible than the 0.005 standard they claimed was infeasible.

We conclude for the reasons stated above the District adequately assessed the cost effectiveness of rule 1105.1.

### IV. THE DISTRICT PREPARED AN ADEQUATE ENVIRONMENTAL ASSESSMENT OF RULE 1105.1

WSPA concedes CEQA[27] did not require the District to prepare a full-blown environmental impact report before adopting rule 1105.1. Rather, the District was only required to prepare a less formal environmental assessment (EA). Nevertheless, WSPA contends, the District did not even meet the less stringent standards for an EA because it focused exclusively on the environmental impact of installing new dry ESP's and ignored the environmental impact of installing wet ESP's.

Admittedly wet ESP technology differs from dry ESP technology in two important respects. In order to operate a wet ESP the flue gas in the FCCU would have to be cooled down from 500 to 700 degrees to approximately 170

---

[25] Health and Safety Code section 40440.8, subdivision (b)(4).

[26] *Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 515 [208 Cal.Rptr. 850, 691 P.2d 606].

[27] Public Resources Code sections 21000–21177.

degrees. In addition a wet ESP, as the name implies, uses water to wash the trapped particles from the collecting plates creating a stream of polluted liquid waste.

WSPA argues the additional energy needed for the cooling and the discharge of the waste water could have significant environmental impacts and should have been analyzed in the EA.

This argument contains a fatal flaw, however. There is no evidence in the record any of the affected refineries intends to use wet ESP technology to meet the emission standards of rule 1105.1. On the contrary, the record shows (1) no refinery has ever used wet ESP technology to reduce particulate emissions from FCCU's; (2) the refineries' consistent position (through WSPA) has been the 0.005 gr/dscf standard is unattainable regardless of the ESP technology used; and (3) contrary to the refineries' position there is substantial evidence the affected refineries can meet the rule's emission standards with dry ESP's (see discussion *ante* at pp. 1019–1021.)

■   An EA is only required to address "significant or potentially significant effects" a project might have on the environment.[28] Clearly, a technology no one intends to use cannot have a "significant or potentially significant effect" on the environment.[29]

We conclude, therefore, the District met its obligation under CEQA to conduct an environmental assessment of its proposed rule.

V.   *THE TRIAL COURT PROPERLY DENIED WSPA'S MOTION TO CORRECT THE SCOPE AND ACCURACY OF THE ADMINISTRATIVE RECORD*

Prior to the hearing on its petition for writ of mandate WSPA moved the court for an order requiring the District to supplement the administrative record with documents relating to rule 1105.1 created prior to January 2002 but not considered by the District board when it adopted the rule in November 2003. WSPA claimed that although the rule was first conceived in 1989 the administrative record contained only a smattering of documents from the period 1989 to 2001. Allegedly missing from the administrative

---

[28] Title 14, California Code of Regulations, section 15252 (CEQA guidelines).

[29] At oral argument the District stated if a refinery did elect to build a wet ESP a supplemental EA would have to be prepared as part of the permitting process. (See tit. 14, Cal. Code Regs., §§ 15187–15189 [CEQA guidelines].)

record were tests, data, internal memoranda and public comments casting doubts on the feasibility and cost-effectiveness of the rule as originally proposed.[30]

The District responded with declarations from its staff members who testified they had turned over every document in their possession relating to a rule to reduce PM10 emissions.

At the hearing on its motion WSPA produced no evidence to dispute the testimony of the District staff; it merely argued the District would "look harder" for the documents if the trial court ordered it to do so. The court found that while some older documents may have been destroyed, the uncontradicted evidence showed the District had made a reasonable search for all existing documents and included them in the administrative record of rule 1105.1.

We conclude the trial court ruled correctly in denying WSPA's motion.

Substantial evidence supports the trial court's finding the District made a diligent search for all records pertaining to the proposed rule limiting PM10 emissions. Furthermore, the destruction of some of these records, at least absent a showing of bad faith, would not invalidate the rule. Our Supreme Court has held "extra-record evidence is generally not admissible in traditional mandamus actions challenging quasi-legislative administrative decisions."[31] And, while the court recognized some exceptions to this general rule,[32] it stated "extra-record evidence can *never* be admitted merely to contradict the evidence the administrative agency relied on in making a quasi-legislative decision or to raise a question regarding the wisdom of that decision."[33] Since these were exactly the purposes for which WSPA sought the extra-record evidence in the present case, the evidence would have been inadmissible even if it had been located.

---

[30] As originally proposed the rule would have limited PM10 emissions to 0.0042 gr/dscf and placed no new restrictions on ammonia slip. It could be argued, therefore, the data, tests, memoranda and other documents WSPA sought to add to the administrative record were irrelevant to the rulemaking process which produced rule 1105.1.

[31] *Western States Petroleum Assn v. Superior Court* (1995) 9 Cal.4th 559, 576 [38 Cal.Rptr.2d 139, 888 P.2d 1268]. This case arose under CEQA but the court held the rule applied in all cases involving mandamus review of quasi-legislative administrative decisions. (*Ibid.*)

[32] *Western States Petroleum Assn v. Superior Court, supra,* 9 Cal.4th at pages 575, footnote 5, 578–579.

[33] *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at page 579, italics added.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

Perluss, P. J., and Zelon, J., concurred.