[No. F055448. Fifth Dist. Oct. 6, 2009.]

CALIFORNIA BUILDING INDUSTRY ASSOCIATION et al., Plaintiffs and Appellants, v.
SAN JOAQUIN VALLEY AIR POLLUTION CONTROL DISTRICT, Defendant and Respondent;
MEDICAL ADVOCATES FOR HEALTHY AIR et al., Interveners and Respondents.

122

COUNSEL

Sheppard Mullin Richter & Hampton, David P. Lanferman, James F. Rusk; Law Offices of Walter P. McNeill and Walter P. McNeill for Plaintiffs and Appellants.

Philip M. Jay and Catherine T. Redmond for Defendant and Respondent.

Edmund G. Brown, Jr., Attorney General, J. Matthew Rodriquez, Chief Assistant Attorney General, Gordon Burns, Deputy Solicitor General, Ken Alex, Assistant Attorney General, Sally Magnani and Lisa Trankley, Deputy Attorneys General, as Amici Curiae on behalf of Defendant and Respondent.

Wilson, Sonsini, Goodrich & Rosati and Douglas J. Clark for Interveners and Respondents.

OPINION

LEVY, J.—Appellants, California Building Industry Association, Coalition for Urban Renewal Excellence, Valley Taxpayers Coalition, and Modesto Chamber of Commerce, challenge the validity of two rules adopted by respondent, San Joaquin Valley Air Pollution Control District (District). These rules, commonly referred to as indirect source review (ISR), are intended to encourage developers to reduce indirect pollution, i.e., mobile source emissions, caused by new development projects. Under ISR, the developer can reduce emissions by incorporating pollution-reducing features

in the project, or by paying a fee to fund offsite projects that will reduce emissions, or by a combination of the two.

The trial court concluded that the District had the power to adopt regulations to mitigate the effects of indirect source pollution, which included the power to impose fees on persons who cause the pollution. The court further found that these fees were valid regulatory fees.

Appellants contend the ISR fees are development fees subject to the Mitigation Fee Act (Gov. Code, § 66000 et seq.) and that they violate that act. Appellants further argue that, even if the ISR fees qualify as regulatory fees, they are invalid as such. According to appellants, the District did not employ a valid method for creating the fees, did not estimate or compute the total costs of the ISR program, and does not have a basis for fairly apportioning the fees. Finally, appellants assert that the District lacked the authority to impose these fees.

As discussed below, the District had the power to adopt the ISR rules, and the fees imposed pursuant to those rules are valid regulatory fees. Accordingly, the judgment will be affirmed.

## BACKGROUND

1. *The District's authority and responsibilities.*

Two statutory schemes regulate air quality in California, the federal Clean Air Act (FCAA) (42 U.S.C. § 7401 et seq.) and the California Clean Air Act (CCAA) (Health & Saf. Code,[1] § 39000 et seq.). Under the FCAA, the Environmental Protection Agency (EPA) is authorized to issue national air quality standards setting the maximum allowable concentration of a given pollutant. (*Safe Air For Everyone v. U.S. E.P.A.* (9th Cir. 2007) 475 F.3d 1096, 1100.) To assure that these air quality standards are met, the states are required to attain air quality meeting specified standards and to do so within a specified period of time. (*Train v. Natural Resources Def. Council* (1975) 421 U.S. 60, 64–65 [43 L.Ed.2d 731, 95 S.Ct. 1470].) To accomplish this goal, states must develop state implementation plans (SIP's) proposing methods for maintaining air quality and submit those SIP's to the EPA for review and approval. (*Safe Air For Everyone v. U.S. E.P.A., supra,* 475 F.3d at p. 1099.) A state may include an ISR program in its SIP. (42 U.S.C. § 7410(a)(5)(A).) EPA-approved SIP's have the force and effect of federal law. (*Ibid.*) Nevertheless, each state has the primary responsibility for assuring air quality within its entire geographic area. (*Train v. Natural Resources Def. Council, supra,* 421 U.S. at p. 64.)

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

The CCAA takes a regional approach to protecting ambient air quality. (§ 39001.) Local and regional authorities, such as the District, have the primary responsibility for control of air pollution from all sources other than vehicular. The California Air Resources Board (CARB) is responsible for the control of vehicular sources of air pollution. (§ 39002.) Nevertheless, air pollution control districts have authority to mitigate vehicle emissions in vehicle use. For example, a district must adopt transportation measures (§ 40717); is to pay particular attention to reducing the emissions from transportation (§ 40910); and may adopt regulations to reduce the number or length of vehicle trips (§ 40716, subd. (a)(2)).

California districts are also authorized to regulate indirect sources of air pollution (§ 40716, subd. (a)(1)) and must include provisions to develop indirect source control programs in their attainment plans (§ 40918, subd. (a)(4)). Further, the District is specifically required to assess fees on indirect sources of emissions in the San Joaquin Valley to recover the costs of District programs related to these sources. (§ 40604.)

The CCAA does not define the term "indirect source." However, under the FCAA, "indirect source" is defined as "a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution." (42 U.S.C. § 7410(a)(5)(C).)

The District is responsible for controlling air pollution in the region formed by eight counties in the San Joaquin Valley (Valley). (§ 40600.) In 1993, the Valley was classified as "serious nonattainment" under federal standards for particulate matter with particle size less than or equal to 10 microns (PM10). In 2004, the Valley was classified as "extreme nonattainment" for the federal one-hour ozone standards. PM10 can be directly emitted geologic material (dust) or can be formed when precursor emissions, such as nitrogen oxides (NOx) and volatile organic compounds (VOC's), react chemically. Ground level ozone (smog) is formed during summer months when NOx and VOC's react in the presence of sunlight.

Due to the Valley's serious nonattainment federal classification for PM10, the District was required to develop an attainment plan that included both a demonstration of future PM10 attainment and provisions to assure that the best available PM10 control measures would be implemented within four years. (42 U.S.C. § 7513a(b).) The District concluded that the rapid Valley growth, and concomitant increase in motor vehicle use, would result in

increases in PM10 emissions. Therefore, as part of its attainment plan, the District committed to adopt ISR regulations to mitigate this increase. The EPA approved this course of action as part of the District's PM10 plan in 2004. (69 Fed.Reg. 30006 (May 26, 2004).)

The District was also required to implement all reasonably available control measures on ozone sources because of the Valley's extreme nonattainment ozone classification. This is reflected in the District's extreme ozone attainment plan, which includes the ISR commitment.

### 2. *The District's ISR program.*

The District adopted its ISR program, denominated rule 9510, on December 15, 2005, to fulfill its PM10 and ozone plan commitments. Rule 3180, which provides the means for the District to recover its costs of administering and operating rule 9510, was also adopted. The development process for these rules began in June 2003 and included public meetings and workshops. The District received and responded to public comments and conducted analyses of cost-effectiveness, socioeconomic impact, emissions reduction, and environmental impact.

The purpose of rule 9510 is to reduce indirect sources of NOx and PM10 emissions from new development projects. An "indirect source" is defined as "any facility, building, structure, or installation, or combination thereof, which attracts or generates mobile source activity that results in emissions of" NOx and PM10.

Rule 9510 requires a certain amount of emission reductions from each new development project. The District found that, although the number of vehicle miles traveled is increasing valleywide, the majority of new NOx emissions are attributable to new development. However, to ensure that each developer is responsible for only its share of emissions, the District "discounts" each project's NOx emissions in two ways. First, a 50 percent emissions credit is given. This ensures that a development is only charged for the vehicle trips that would not have occurred but for the development. In other words, only one-way trips from the site are counted. Second, credit is given for the increasingly stringent state and federal vehicle tailpipe controls that will reduce NOx over time.

In contrast, operational PM10 emissions (dust) from a project do not decline over time. Accordingly, rule 9510 requires mitigation equal to half of the emissions after build-out for 10 years. The end result is that projects must reduce their operational NOx emissions by 33 percent and their operational PM10 emissions by 50 percent over a 10-year period.

A developer can accomplish the required emission reductions onsite by incorporating measures to reduce vehicle miles traveled, vehicle trips and/or areawide sources of emissions such as fireplaces, wood stoves and landscape equipment. Alternatively, the emissions can be reduced through paying a fee to fund offsite emission reducing projects. Finally, the developer can use a combination of onsite emission reduction measures and a fee to fund offsite emission reduction projects.

Under rule 9510, the proponent of a new development project is required to submit an air quality impact assessment (AIA) to the District before or at the project's final discretionary approval by the approving public agency. Either the developer or District staff prepares the AIA by using an approved model to quantify the emissions attributable to the new development. The AIA additionally identifies any voluntary onsite reduction measures that are components of the project design. These onsite reduction measures include increased energy efficiency, electrical landscape maintenance equipment, elimination of wood-burning devices, increased residential densities, locating near public transit, incorporating mixed uses (residential/retail), transportation management demand programs, and incorporating pedestrian/bicycle facilities. The incorporation of such onsite measures can substantially reduce potential offsite fees.

The project information, including any voluntary onsite reduction measures, is input into the urban emissions model (URBEMIS), a District-approved computer model that quantifies NOx and PM10 attributable to a development. Another model calculates construction emissions. If the onsite reduction measures do not reduce 33 percent of the project's NOx emissions and 50 percent of the PM10 emissions, the developer is required to pay a fee to the District for offsite emission reduction projects.

Fees paid under rule 9510, if any, are directly proportional to tons of NOx and PM10 that are not mitigated by the developer through onsite features. The per-ton fees are based on the historical and projected cost to achieve reductions through District emission reduction programs.

Rule 9510 fees can only be used for reduction programs. The collected fees are segregated by pollutant from other District revenue in a separate mitigation fund and are used only to "buy" offsite emission reduction projects. For every ton of NOx and PM10 not mitigated by the developer onsite, the District purchases an equivalent reduction of that same pollutant offsite.

Before adopting the ISR program, the District prepared a detailed spending plan demonstrating how offsite mitigation fees collected under rule 9510 would be spent. At that time, the District identified more than $400 million in cost-effective projects that were available.

*3. The underlying lawsuit.*

Appellants filed a complaint and petition for writ of mandate challenging the District's adoption of the ISR regulations, i.e., rules 9510 and 3180. In their complaint and petition, appellants alleged that these rules imposed invalid development fees, regulatory fees, exactions, state agency fees, and/or special taxes, were unconstitutional, and were adopted in excess of the District's authority. Following a bench trial, the court ruled in the District's favor on all causes of action.

On appeal, appellants have raised only certain of these claims. Appellants argue that the ISR fees are invalid both as development fees and regulatory fees and that the District did not have the authority to impose the fees.

## DISCUSSION

*1. Standard of review.*

The Legislature has granted air pollution control districts the authority to adopt and implement regulations to reduce or mitigate emissions from indirect and areawide sources of air pollution. (§ 40716, subd. (a).) Accordingly, the District's adoption of rules 9510 and 3180 was a quasi-legislative action. (Cf. *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

In reviewing quasi-legislative actions, the authority of the trial court "is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168].) Courts exercise such limited review out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority. (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 211–212 [157 Cal.Rptr. 840, 599 P.2d 31].) However, the agency must act within the scope of its delegated authority, employ fair procedures, and be reasonable. "A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." (*Id.* at p. 212, fn. omitted.) Nevertheless, in technical matters requiring the assistance of experts and the study of scientific data, courts will permit agencies to work out their problems with as little judicial interference as possible. (*Western States*

*Petroleum Assn. v. South Coast Air Quality Management Dist.* (2006) 136 Cal.App.4th 1012, 1018 [39 Cal.Rptr.3d 354] (*Western States Petroleum*).)

The appellate court reviews the trial court's decision de novo under the same standard. (*Western States Petroleum, supra,* 136 Cal.App.4th at p. 1018.)

## 2. *The ISR fees are regulatory fees, not development fees.*

■ There are three general categories of fees or assessments that are distinguishable from special taxes and thus can be imposed without a two-thirds majority vote. (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 [64 Cal.Rptr.2d 447, 937 P.2d 1350] (*Sinclair Paint*).) These categories are: "(1) special assessments, based on the value of benefits conferred on property; (2) development fees, exacted in return for permits or other government privileges; and (3) regulatory fees, imposed under the police power." (*Ibid.*)

■ A fee is considered a development fee if it is exacted in return for building permits or other governmental privileges so long as the amount of the fee bears a reasonable relationship to the development's probable costs to the community and benefits to the developer. (*Sinclair Paint, supra,* 15 Cal.4th at p. 875.) Under the Mitigation Fee Act (Gov. Code, § 66000 et seq.), such a fee is defined as "a monetary exaction other than a tax or special assessment . . . that is charged by a local agency to the applicant in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities related to the development project . . . ." (Gov. Code, § 66000, subd. (b).) When a fee is imposed "as a condition of approval of a development project," the local agency must meet specific statutory requirements, including identifying the purpose of the fee and the use to which the fee is to be put, and determining how there is a reasonable relationship between the fee and the development project. (Gov. Code, § 66001, subds. (a), (b).) Also, a fee imposed "as a condition of approval of a proposed development . . . or development project" is limited to the estimated reasonable cost of providing the service or facility. (Gov. Code, § 66005, subd. (a).)

■ In contrast, when a fee is charged for the associated costs of regulatory activities and does not exceed the reasonable cost of carrying out the purposes and provisions of the regulation, it falls within the category of a regulatory fee. (*California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 945 [94 Cal.Rptr.2d 535] (*California Assn. of Prof. Scientists*).) Regulatory fees are not dependent on government-conferred benefits or privileges and are imposed under the police power. (*Sinclair Paint, supra,* 15 Cal.4th at p. 875.)

Appellants contend that the ISR fees are development fees subject to the Mitigation Fee Act and that the fees violate the act. According to appellants, the ISR fees meet the Government Code section 66000, subdivision (b), definition of development fees because they were imposed "in connection with approval of a development project" for the purpose of defraying the cost of public facilities, i.e., public services or community amenities, related to the development project. In other words, they are fees "that alleviate the effects of development on the community." (*Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 696 [37 Cal.Rptr.3d 149, 124 P.3d 719] (*Barratt American*).)

However, "a fee does not become a 'development fee' simply because it is made in connection with a development project." (*Barratt American, supra*, 37 Cal.4th at p. 699.) Rather, approval of the development project must be conditioned on payment of the fee. (*Ibid.*; *Capistrano Beach Water Dist. v. Taj Development Corp.* (1999) 72 Cal.App.4th 524, 529–530 [85 Cal.Rptr.2d 382].) The Mitigation Fee Act specifically limits its application to situations where the fee or exaction is imposed as a condition of approval of a development project. (Gov. Code, §§ 66001, subds. (a), (b), 66005, subd. (a), 66006, subd. (c).)

Here, approval of a development project is not conditioned on the developer's payment of the ISR fees. The ISR fees are not exacted in return for permits or other government privileges. Thus, the ISR fees are not development fees and, therefore, are not subject to the Mitigation Fee Act. Rather, the fees are regulatory in nature. They are designed to mitigate growth in air pollution from new development in order to achieve and maintain federal air quality standards. Accordingly, this court need not decide whether the District complied with the Mitigation Fee Act when adopting the ISR regulations.

3. *The ISR fees are valid regulatory fees.*

As discussed above, a regulatory fee is charged to cover the reasonable cost of a service or program connected to a particular activity. Such a fee may be validly imposed under the police power for the purpose of legitimate regulation when the fee does not exceed the amount required to carry out the purposes and provisions of the regulation and is not levied for unrelated revenue purposes. (*Sinclair Paint, supra*, 15 Cal.4th at p. 876; *San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1146, fn. 18 [250 Cal.Rptr. 420] (*San Diego Gas & Electric*).)

■ Regulatory fees are not compulsory. Rather, fee payers have some control both over when, and if, they pay any fee, i.e., when or if they elect to engage in a regulated activity, and/or the amount of the fee they are compelled to pay. For example, fee payers can modify their conduct to pollute less or consume less water. (*California Assn. of Prof. Scientists, supra,* 79 Cal.App.4th at p. 950; *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 194 [29 Cal.Rptr.2d 128]; *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 907 [223 Cal.Rptr. 379].) Further, the absence of any perceived "benefit" accruing to the fee payer does not invalidate a regulatory fee. (*California Assn. of Prof. Scientists, supra,* 79 Cal.App.4th at p. 945.)

" '[T]o show a fee is a regulatory fee and not a special tax, the government should prove (1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.' " (*Sinclair Paint, supra,* 15 Cal.4th at p. 878.) In other words, there must be a nexus between the amount of the fee and the cost of the service for which the fee is charged. (*Id.* at p. 881.)

Appellants contend the ISR exacts an invalid regulatory fee. According to appellants, the District did not use a valid method to calculate the fees, did not prove the estimated costs of the regulatory activity, and did not prove that its basis for apportioning the costs of the program bears a fair or reasonable relationship to the payer's burdens on the District.

a. *The validity of the District's fee calculation method.*

■ A valid fee calculation method is one that establishes a reasonable relationship between the fee charged and the burden posed by the development. (*Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 235 [1 Cal.Rptr.2d 818].) However, proportionality of the fees, i.e., whether the fees collected exceed the cost of the regulatory program they are collected to support, need not be proved on an individual basis. Rather, the agency is allowed to employ a flexible assessment of proportionality within a broad range of reasonableness in setting fees. (*California Assn. of Prof. Scientists, supra,* 79 Cal.App.4th at pp. 948–949.)

Here, a new development project's emissions and credits for onsite mitigation measures are determined by a computer model. A fee is charged based on a dollar-per-ton estimate of the cost for the District to reduce the emissions offsite that the developer does not mitigate onsite.

Appellants argue the District failed to establish a reasonable relationship between the fee charged and the burden posed by a new development.

According to appellants, the calculation method improperly charges for the total emissions and total vehicle trips of a development rather than the net increase in emissions and the net increase in vehicle trips. In other words, the fee is calculated as if the immediately preceding land use at the site produced zero emissions and zero vehicle trips.

However, contrary to appellants' argument, the ISR regulations do account for existing emissions. The emission reduction targets are based on predicted *growth* in emissions from new development. The reconstruction of any development project rebuilt to essentially the same use and intensity is excluded from ISR. Thus, unlike the situation in *Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840 [124 Cal.Rptr.2d 744] (school impact fees assessed on replacement housing), cited by appellants, the fees are not unrelated to the development's impact. Further, in its calculations, the District gives every development project subject to ISR an automatic 50 percent credit in both its NOx and PM10 emissions. This way a fee is not charged for trips that are the responsibility of another new source or an existing indirect source.

Appellants further contend that URBEMIS, the computer model used by the District to calculate air quality impacts from new development, is flawed. URBEMIS is a project level model. Appellants assert that URBEMIS yields excessive fees on both the regional and individual levels. According to appellants, the travel demand model (TDM) computer program, which is used by regional transportation planning agencies to calculate travel impacts within the planning region, is more accurate and appropriate.

However, before the rules were adopted, the District undertook extensive efforts to ensure that URBEMIS was the best tool for ISR. The District hired consultants to recommend the most suitable model and identify areas for improvement. After receiving a report recommending URBEMIS, the District initiated an extensive statewide effort to update the URBEMIS model. After further recommendations were incorporated into the report, a peer review by several well-respected researchers in the field took place. Thereafter, those recommendations were also incorporated and approved.

Appellants' criticism of URBEMIS indicates no more than the existence of a difference in expert opinion. Where, as here, review is of a quasi-legislative action, a court will interfere as little as possible in such technical matters. (*Western States Petroleum, supra*, 136 Cal.App.4th at p. 1018.) Rather, it was up to the District to decide which expert opinion to accept. (*Id.* at p. 1020.)

As discussed above, the administrative record provides considerable evidence in support of the District's determination that URBEMIS is an

appropriate computer model for ISR. Accordingly, it must be concluded that the District's use of URBEMIS is reasonable.

Finally, appellants argue that the fee is a penalty calculated to incentivize project design changes and thus fees are not imposed in proportion to a project's actual emissions. Appellants posit that a developer could reduce fees by submitting a "dirty" version of a project and then "clean it up" with design changes. This way, appellants contend, two identical projects could pay different fees.

However, the analysis of every development begins with the unmitigated NOx and PM10 emissions as calculated by the approved model. This is the operational baseline. Thereafter, the mitigation measures are taken into account. Thus, it does not matter whether the project is proposed as "clean" or "dirty." The analysis is the same because the starting place for each project is the same, i.e., unmitigated.

In sum, the District established that it employs a valid method for calculating the ISR fees.

    b.   *The estimated costs of the regulatory activity.*

Appellants contend the fees are invalid because there is no estimate of the total costs of the ISR program but rather only an estimate of the revenue the District expects the program to generate. However, the cost for this program, i.e., the fee amount, is dependent on how the developers achieve the necessary reductions in emissions. The balance of emissions not reduced by onsite mitigation measures is assessed a flat fee based on what it costs the District per ton to fund offsite emission reduction projects. Thus, the program cost is the cost per ton of the offsite emission reduction necessitated by the development. This cost is calculated and the fee charged accordingly. Consequently, the fees are calculated before the specific reduction projects are identified and funded. Nevertheless, the District has estimated the emission reduction cost through a careful analysis of past and future emission reduction projects. The fees are then charged in direct proportion to the amount of NOx or PM10 that the developer chooses not to mitigate onsite. Therefore, contrary to appellants' position, the District has established the estimated costs of the program.

    c.   *Apportionment of the program costs.*

As discussed above, the costs of a regulation must be apportioned so that the amount of the fee bears a reasonable relationship to the social or economic burden caused by the regulated entity. (*Sinclair Paint, supra,* 15

Cal.4th at p. 881.) However, certainty is not required. The record need only demonstrate a *reasonable* relationship, not an exact relationship, between the fees to be charged and the *estimated* cost of the program. (*City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264, 283 [17 Cal.Rptr.2d 845].)

The District produced a lengthy and detailed staff report regarding the ISR rules. Regarding the need for the ISR program, the District determined that there have been, and will continue to be, tremendous population increases in the Valley. The District further concluded that growth in new development parallels these population increases and that such new development contributes to an increase in air pollution. The report explains in detail how the District reached these conclusions and calculated the projected increase in NOx and PM10 emissions attributable to new development. The District therefore demonstrated a connection between population growth, new development, and increased emissions.

The report also outlines the District's analysis of indirect source emissions and its method and rationale for determining the share of emissions attributable to individual development projects, i.e., an explanation of the requisite reasonable fee-cost relationship. This includes estimates of vehicle trips per average household, projections of the reductions necessary to counteract the growth in emissions, and the calculations for allocating the pollution attributable to the development.

Appellants contend the District has not established that the ISR fees are adequately apportioned. According to appellants, the District's methodology does not accurately calculate the "burdens" caused by new development in the form of increased total vehicle miles traveled (VMT) and the concomitant NOx and PM10 emissions. Appellants argue that the proper starting point for apportionment is the VMT for the region as a whole, not the VMT for an individual project as is the case in the District's calculation. Appellants are again arguing that the District should use the TDM computer model, not URBEMIS, in calculating the ISR fees.

However, as discussed above, the District diligently analyzed various computer models and determined that URBEMIS was the appropriate tool for calculating the ISR fees. The calculation need not be exact, just reasonable. Appellants' criticisms are nothing more than a difference in expert opinion. Contrary to appellants' position, the District has shown that the fees charged are *reasonably* related to the amount of pollution, or "burden," attributable to each new development. The more a new development increases air pollution, the more the developer pays.

#### 4. *The District had the authority to adopt the ISR regulations.*

Appellants contend the District exceeded its authority in adopting the ISR regulations. Based on the fact that CARB is responsible for the control of vehicular sources of air pollution, appellants characterize the indirect source fees as the District's "thinly-disguised—and invalid—attempt to do 'indirectly' that which it is prohibited from doing directly—imposing fees on emissions" that are generated by motor vehicles. In support of this position, appellants claim that not only did the District fail to identify any statutory authority for these fees but, in fact, no such authority exists. Appellants also assert that the District lacked authority to define "indirect sources" to include new development that does not in itself emit pollutants.

First, contrary to appellants' argument, the District did identify the source of its authority to adopt the ISR rules as required under section 40727. The resolution adopting rules 9510 and 3180 cited to sections 40716 (districts are authorized to regulate indirect sources of air pollution), 42311, subdivision (g) (a district may adopt a schedule of fees to be assessed on indirect sources of emissions), and 40604 (San Joaquin Valley Unified Air Pollution Control District shall adopt a schedule of fees to be assessed on indirect sources of emissions) in the recitals. The fact that the District did not again specify these authorities in the findings section of the resolution does not alter this conclusion. The District identified its statutory authority.

Further, it is clear from these statutes that the District had the authority to adopt the ISR rules. Not only is the District authorized to regulate and assess fees on indirect sources of emissions under sections 40716 and 42311, section 40604 requires the District to assess such fees. Under section 40716, subdivision (a), the District may adopt regulations to "[r]educe or mitigate emissions from indirect and areawide sources of air pollution" and to "[e]ncourage or require the use of measures which reduce the number or length of vehicle trips." Section 40604 states that the San Joaquin Valley Unified Air Pollution Control District board "shall adopt, by regulation, a schedule of fees to be assessed on areawide or indirect sources of emissions that are regulated, but for which permits are not issued, by the district to recover the costs of district programs related to these sources." (§ 40604, subd. (a).) Thus, the District has specific statutory authority to regulate and assess fees on indirect pollution sources. This is precisely what it did in adopting the ISR rules.[2]

---

[2] Appellants' reliance on three opinions of the Attorney General is misplaced. Opinion No. 91-208 and Opinion No. 92-109 analyze whether districts can directly or indirectly impose parking fees for the purpose of reducing pollution. (74 Ops.Cal.Atty.Gen. 196 (1991); 75 Ops.Cal.Atty.Gen. 256 (1992).) Moreover, in concluding that such fees are not valid, the Attorney General apparently overlooked section 42311, subdivision (g), which specifically

Finally, appellants argue that the District lacked authority to define "indirect source" and that its definition is too broad. Appellants question how a housing development, which does not in and of itself cause any significant emissions, can be an indirect source of pollution.

■ "Indirect source" is not defined in the CCAA. However, as an agency acting in a quasi-legislative manner, the District has the power to elaborate the meaning of key statutory terms. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 800 [85 Cal.Rptr.2d 844, 978 P.2d 2].)

■ Moreover, the District's definition closely parallels both the federal and CARB definitions of "indirect source." As noted above, the FCAA defines "indirect source" as "a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution." (42 U.S.C. § 7410(a)(5)(C).) New housing developments certainly fall within this category as buildings and structures. Similarly, CARB defines "indirect source" as " 'any facility, building, structure or installation, or combination thereof which generates or attracts mobile source activity that results in the emissions of any pollutant for which there is a state ambient air quality standard.' " (76 Ops.Cal.Atty.Gen., *supra*, at p. 13.)

Based on the above definitions, the Attorney General concluded that "an indirect source may be considered to be any development which attracts direct vehicular sources of air pollution." (76 Ops.Cal.Atty.Gen., *supra*, at p. 13.) This would, of course, include a new housing development. The fact that a housing development does not itself emit pollutants is what causes it to be an "indirect source" of pollution. Otherwise, it would be a direct source. The District's definition of "indirect source" is not only reasonable but is also the only logical way to interpret the term.

In sum, the District is not attempting to do "indirectly" that which it is prohibited from doing directly. The District is specifically authorized to both regulate and assess fees on developments that attract mobile sources of pollution, i.e., emissions generated by motor vehicles.[3]

---

authorizes districts to assess fees on indirect sources of pollution. Thus these opinions are not only inapposite, but the analyses are incomplete. Opinion No. 92-519 concerns whether a district may impose a permit system upon indirect sources of air pollution. (76 Ops.Cal.Atty.Gen. 11 (1993).) Again, this opinion does not provide authority for appellants' position.

[3] Appellants' motion and request for judicial notice, filed on December 4, 2008, is denied.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

Vartabedian, Acting P. J., and Cornell, J., concurred.

A petition for a rehearing was denied October 30, 2009, and appellants' petition for review by the Supreme Court was denied January 13, 2010, S177935.