**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE NATIONAL ASSOCIATION OF
HOME BUILDERS,
              *Plaintiff-Appellant,*

    v.

THE SAN JOAQUIN VALLEY UNIFIED
AIR POLLUTION CONTROL DISTRICT;
THE GOVERNING BOARD OF THE SAN
JOAQUIN VALLEY UNIFIED AIR
POLLUTION CONTROL DISTRICT,
             *Defendants-Appellees,*

    and

ENVIRONMENTAL DEFENSE; SIERRA
CLUB,
  *Defendant-intervenors-Appellees,*

No. 08-17309

D.C. No.
1:07-cv-00820-LJO-
DLB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued December 11, 2009
Submitted December 7, 2010
San Francisco, California

Filed December 7, 2010

Before: Betty B. Fletcher, Sidney R. Thomas, and
N. Randy Smith, Circuit Judges.

Opinion by Judge B. Fletcher;
Partial Concurrence and Partial Dissent by
Judge N.R. Smith

19529

## COUNSEL

Duane J. Desiderio, Washington, DC, Robert C. Horton and Paul S. Weiland, Nossaman LLP, Irvine, California, for plaintiff-appellant The National Association of Home Builders.

Philip M. Jay and Catherine T. Redmond, San Joaquin Valley Unified Air Pollution Control District, Fresno, California, for

defendant-appellee The San Joaquin Valley Unified Air Pollution Control District and the Governing Board of the San Joaquin Unified Air Pollution Control District.

Paul Cort and Gregory Cahill Loarie, Earthjustice, Oakland, California, for defendant-intervenor-appellee Environmental Defense and Sierra Club.

Lisa Trankley, Office of the Attorney General, Sacramento, California, for amicus curiae State of California.

Peter McVeigh, U.S. Department of Justice Environment and Natural Resources Division, Washington, DC, for amicus curiae Environmental Protection Agency.

---

## OPINION

B. FLETCHER, Circuit Judge:

In response to levels of pollution that violated national air quality standards, the San Joaquin Valley Unified Air Pollution District adopted "Rule 9510," which requires development sites to reduce the amount of pollutants they emit. The National Association of Home Builders (NAHB) sued the District, claiming that Rule 9510 is preempted by the Clean Air Act. The district court held that Rule 9510 is not preempted. We affirm.

### I.

### A.

The residents of the San Joaquin Valley breathe "an air that kills."[1] The air in the Valley contains dangerous levels of par-

---

[1]A.E. Housman, *A Shropshire Lad* 57 (1903).

ticulate matter and ozone pollution, substances that every year cause the deaths of many Americans, not to mention much cardiorespiratory disease. *See, e.g.*, National Ambient Air Quality Standards for Ozone, 73 Fed. Reg. 16,436, 16,448 (Mar. 27, 2008); National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 61,144, 61,154 (Oct. 17, 2006).

Under the Clean Air Act (often "Act") and California law, Defendant San Joaquin Valley Unified Air Pollution Control District ("District") promulgates and enforces regulations to meet national air quality standards set by the Environmental Protection Agency (EPA). When the District began developing Rule 9510, the regulation at issue in this appeal, the District's air quality fell significantly short of federal standards in three areas: ozone, particulate matter under 10 microns in diameter ("PM10"), and particulate matter under 2.5 microns in diameter ("PM2.5."). Because the air in the District fell short of federal standards, the District had a duty under the Clean Air Act to develop implementation plans outlining how it would attain and maintain national standards. 42 U.S.C. § 7509(d) (2006). This duty is enforceable by sanctions. *Id.* § 7509(b).

In developing its implementation plans for PM10 and ozone, the District's studies found that construction and development sites contribute significantly to the Valley's emissions of PM10 and nitrogen oxides ("NOx"). NOx can be a chemical precursor to both ozone and particulate matter. The District found that due to the Valley's projected growth in population, emissions from construction and development would only grow. The District also projected that during the period from 2006 to 2010, construction equipment working on new development in the Valley would increase NOx emissions by 21.3 tons per day. That figure outstrips even the increase in motor vehicle emissions that the population growth was expected to cause. During this same 2006-2010 period, construction equipment was predicted to increase

PM10 emissions by 1.4 tons per day. Vehicles associated with new development would stir up road dust, further increasing PM10 emissions by 5.2 tons per day. To forestall these projected increases, and to prevent "backsliding" once national air quality standards were satisfied, the District developed Rule 9510, which regulates emissions from development projects.

The Rule applies only to certain development projects.[2] When the developer of one of these projects applies for approval, the District or the developer makes an "Air Impact Assessment," using an approved computer model to determine how much NOx and PM10 the development will produce if its emissions are not mitigated. These "baseline" emissions are of two sorts. The first are "construction equipment emissions," emissions of NOx and PM10 that come from construction equipment of greater than 50 horsepower "used or associated with the development project." The second sort of emissions are "operational emissions," which, as the name suggests, are those emissions that come from a development once it is up and running. In this appeal NAHB challenges only the Rule's regulation of construction equipment emissions, not its regulation of operational emissions.

Rule 9510 requires the District's or developer's computer model to measure the baseline level of construction equipment emissions by assessing the emissions that average California construction equipment would emit if it were used to complete the development. This baseline level can be adjusted if the model's usual assumptions about the development site are shown to be incorrect — if, for example, the construction

---

[2]The Rule applies to any development that includes 50 residential units, 2,000 square feet of commercial space, 25,000 square feet of light industrial space, 100,000 square feet of heavy industrial space, 20,000 square feet of medical office space, 39,000 square feet of general office space, 9,000 square feet of educational space, 10,000 square feet of government space, 20,000 square feet of recreational space, or 9,000 square feet of space that does not fit one of the other categories.

will take a shorter than usual time to complete or if the size of the construction itself is smaller than the model assumed.

From that baseline calculation, Rule 9510 requires a 20% reduction in NOx emissions and a 45% reduction in PM10 emissions. A developer can submit information to the District on the construction equipment it will use at the site in order to refine the estimate of how much pollutant the site's construction equipment will actually emit. If the estimate shows that the construction equipment the developer plans to use at the site will already reduce NOx emissions by 20% and PM10 emissions by 45% from the baseline calculation, the developer need do no more. If the development site, under the estimate, cannot meet the required emissions reductions, a development may reduce its emissions by using add-on controls, cleaner fuels, or more advanced equipment. Alternatively, instead of reducing emissions, a development may simply pay fees that the District then uses to fund emissions reductions elsewhere.[3]

## B.

On June 6, 2007, NAHB filed a complaint in federal court asserting, among other claims, that the Clean Air Act preempts the provisions of Rule 9510 that address emissions from construction equipment. The district court allowed the Environmental Defense Fund and the Sierra Club ("Intervenors") to intervene to defend Rule 9510 along with the District. On cross-motions for summary judgment, the district court granted summary judgment to the District and Intervenors and denied it to NAHB.

---

[3]The Rule also requires a development to reduce by 33.3% its baseline operational emissions of NOx, and by 50% its baseline operational emissions of PM10. As with construction equipment emissions, a developer may comply with the operational emissions requirement by reducing onsite emissions, by paying fees, or any combination of the two. As we have noted, NAHB does not challenge this part of the Rule.

NAHB timely appealed. The district court had original jurisdiction under 28 U.S.C. § 1331, *see, e.g.*, *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1047, 1048-49 (9th Cir. 2008), and we have appellate jurisdiction under 28 U.S.C. § 1291.

## II.

## A.

The Clean Air Act divides regulatory authority between the states and the federal government. The EPA sets national air quality standards, but the states have the responsibility to adopt state implementation plans, or SIPs, to achieve the national standards. SIPs are then submitted to the EPA for its approval. Generally speaking, the Act gives the states the job of regulating stationary sources of pollution, but the EPA, and with the EPA's permission California, are responsible for regulating emissions from motor vehicles and other mobile sources. *See generally Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1078-80 (D.C. Cir. 1996).

The District adopted Rule 9510 under section 110(a)(5) of the Act, a provision addressing "indirect sources," which do not fit neatly into the categories of stationary source and mobile source. *See Sierra Club v. Larson*, 2 F.3d 462, 468 (1st Cir. 1993) (noting that "the 'indirect source' provision . . . blur[s]" the Act's general division of regulatory authority). Section 110(a)(5) authorizes the states to adopt "any indirect source review program."[4] 42 U.S.C. § 7410(a)(5)(A)(i)

---

[4]A state may, but is not required to, include such a program in its SIP. 42 U.S.C. § 7410(a)(5)(A)(i) (2006). If the EPA approves the SIP, the indirect source review program takes on the status of federal law. *Trs. for Alaska v. Fink*, 17 F.3d 1209, 1210 n.3 (9th Cir. 1994).

Rule 9510 was submitted to the EPA for approval in December 2006. Remarkably, the EPA did not issue a notice of proposed rulemaking on Rule 9510 until May 2010. Revisions to the California State Implementa-

(2006). An "indirect source review program" means "the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution" that would contribute to the exceedance of national air quality standards or would prevent the maintenance of those standards. *Id.* § 7410(a)(5)(D). An "indirect source" is itself defined as

> a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply . . . , including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

*Id.* § 7410(a)(5)(C). The District believes Rule 9510 is an indirect source review program because it regulates the emissions from construction sites, an indirect source.

NAHB, on the other hand, dismisses Rule 9510 as a ruse adopted simply to regulate emissions from nonroad vehicles, a task that the Act prevents California from attempting without first securing the EPA's approval. NAHB relies on section 209(e) of the Act, which reads in pertinent part:

> (e) Nonroad engines or vehicles

---

tion Plan, San Joaquin Valley Unified Air Pollution Control District, 75 Fed. Reg. 28,509 (May 21, 2010). In its notice of proposed rulemaking, the EPA proposed to approve Rule 9510. It has not, however, yet taken final administrative action on Rule 9510. Accordingly, we lift our stay of this matter, entered on May 20, 2010.

(1) Prohibition on certain State standards

No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles subject to regulation under this chapter—

(A) New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower.

(B) New locomotives or new engines used in locomotives.

. . . .

(2) Other nonroad engines or vehicles

(A) In the case of any nonroad vehicles or engines other than those referred to in subparagraph (A) or (B) of paragraph (1), the Administrator shall, after notice and opportunity for public hearing, authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.

42 U.S.C. 7543(e).

Section 209(e)(1) expressly prohibits any state from "adopt[ing] or attempt[ing] to enforce any standard or other requirement relating to the control of emissions" from "[n]ew engines" smaller than 175 horsepower "which are used in construction equipment or vehicles." Section 209(e)(2) creates a zone of implied preemption. It requires the EPA's authorization before California can "adopt and enforce standards and other requirements relating to the control of emissions" from "any nonroad vehicles or engines" other than those referred to in section 209(e)(1). Any such standard or requirement that the EPA has *not* duly authorized, therefore, is impliedly preempted by section 209(e)(2). *Pac. Merchant Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1113 (9th Cir. 2008).

NAHB contends that section 209(e)(1) expressly preempts, and section 209(e)(2) impliedly preempts, Rule 9510's regulation of construction equipment.[5] We disagree and hold that Rule 9510 is preempted under neither provision.

### III.

**[1]** Section 209(e)(1) of the Act preempts only those standards or requirements relating to the control of emissions from "new" construction equipment. The Act does not define what the word "new" in that provision means, but the EPA has interpreted section 209(e)(1)'s use of the word "new" to mean "showroom new," that is, never sold. *See* 40 C.F.R. § 1074.5 (2009). Under this interpretation, section 209(e)(1) would not preempt Rule 9510 because none of the construction equipment that Rule 9510 regulates could possibly be "showroom new."

**[2]** About a decade and a half ago, the D.C. Circuit

---

[5]Section 209(e)(1)'s express preemption would only extend, of course, to construction equipment with engines of less than 175 horsepower. 42 U.S.C. § 7543(e)(1)(A).

deferred to the EPA's definition of "new" under *Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 834 (1984). *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1084-87 (D.C. Cir. 1996). After observing that the word "new" in section 209(e)(1) lacked a specific statutory definition, the D.C. Circuit noted that the EPA's definition made the use of "new" in section 209(e)(1) consistent with the word's use elsewhere in the Act. *See* 88 F.3d at 1085-86; *see also Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972) (recognizing *in pari materia* as a logical and well established canon of statutory construction). Nor did the EPA's definition render any provision of the Act a "nullity," 88 F.3d at 1086, or fly in the face of the legislative history, *id.* at 1086-87. Thus the EPA had not ignored the unambiguously expressed intent of Congress and had based its definition on a permissible construction of the statute. *Id.* at 1087. We agree with the D.C. Circuit, and NAHB has offered us no reason to think otherwise and so create a circuit split. Section 209(e)(1) is inapplicable to Rule 9510 and cannot preempt it.

## IV.

**[3]** Section 209(e)(2) impliedly preempts "standards and other requirements relating to the control of emissions" from "any nonroad vehicles or engines other than those referred to in [section 209(e)(1)]." 42 U.S.C. § 7543(e)(2)(A) (2006). The District and Intervenors do not dispute that the construction equipment regulated by Rule 9510 qualifies as "nonroad vehicles or engines" under section 209(e)(2). The definitions of "nonroad engine" and "nonroad vehicle" in section 216 of the Act are comprehensive enough to include construction equipment, *see id.* § 7550(10)-(11), and section 209(e)(2)'s phrase "*other than* those referred to in [section 209(e)(1)]," *id.* at 7543(e)(2)(A) (emphasis added), shows that the engines and vehicles referred to in section 209(e)(1), which include construction equipment, do count as nonroad engines and vehicles.

In NAHB's view, section 209(e)(2) preempts Rule 9510 because the Rule "adopt[s] and enforce[s] standards and other requirements relating to the control of emissions from" construction equipment. *Id.* § 7543(e)(2)(A). Relying on *Engine Manufacturers Ass'n v. South Coast Air Quality Management District*, 541 U.S. 246 (2004), and *Pacific Merchant Shipping Ass'n v. Goldstene*, 517 F.3d 1108 (9th Cir. 2008), NAHB argues that Rule 9510 sets "standards and other requirements" because it commands developers to use construction equipment that reduces "baseline" emissions by a particular percentage, on pain of paying fees. Developers can comply with Rule 9510 in several different ways — by using cleaner fuels, or by buying newer equipment, or simply by paying fees — but whether Rule 9510 sets "standards" or "other requirements" is analytically separate from how those standards or requirements are enforced. Rule 9510 establishes standards or other requirements, NAHB contends, no matter how much regulatory flexibility it allows developers in complying with them.

**[4]** We agree with NAHB's premise that under section 209(e)(2) the existence of "standards" or "other requirements" is a question separate from how the standards or requirements are enforced. As we shall explain, however, NAHB's claim of preemption does not follow from its premise. Even if Rule 9510 establishes standards or requirements, those requirements do not relate to the control of emissions from construction equipment.

In so holding, we think it crucial that the District adopted Rule 9510 under the Act's "indirect source review program" provision, section 110(a)(5). But the parties dispute whether section 110(a)(5) actually authorizes Rule 9510. We therefore examine first whether Rule 9510 fits within the terms of section 110(a)(5). We then turn to the authorities, that, according to NAHB, require us to hold Rule 9510 preempted.

A.

NAHB argues that Rule 9510 cannot qualify as an indirect source review program under section 110(a)(5) because the Rule is directed at construction equipment and not the construction site itself. While there is surprisingly little precedent interpreting section 110(a)(5) and seemingly no case law illuminating the precise question presented here, we think the plain language of the statute disposes of NAHB's argument.

**[5]** NAHB correctly observes that Rule 9510 is ultimately directed at emissions that come from construction equipment. This fact by itself, however, cannot mean that Rule 9510 falls outside the bounds of section 110(a)(5)'s "indirect source review program." Emissions from any indirect source come from the direct sources located there; that is precisely what makes an indirect source indirect. Every regulation of the emissions from an indirect source, then, will ultimately regulate direct sources. If an indirect source review program were not allowed in some circumstances to impute direct sources of emissions to an indirect source as a whole, there could be no regulation of the emissions from indirect sources and no indirect source review program could exist.

NAHB relies heavily on the proviso in the statute reading, "Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph." 42 U.S.C. § 7410(a)(5)(C). According to NAHB, because Rule 9510 regulates emissions from a direct emissions source — construction equipment — the Rule institutes a program of reviewing direct sources, not indirect ones.

The statutory proviso on which NAHB relies only makes sense if it is read to prohibit an indirect source review program from targeting direct sources "at, within, or associated with, any indirect source" *apart from* the program's regulation of an indirect source. If the proviso were read to prohibit

a regulatory effect on direct sources while they are at an indirect source, there could be no indirect source review programs. As we have explained, regulation of emissions from an indirect source necessarily regulates emissions from direct sources.

**[6]** We cannot conclude that Rule 9510 comes within section 110(a)(5)'s "direct emissions sources" proviso, for the simple reason that Rule 9510 does not target direct sources apart from its regulation of the indirect source as a whole. The Rule, after all, measures the emissions it regulates by reference to a particular development site. The "baseline" amount of emissions, and the required reduction in emissions from that baseline, are both calculated in terms of the development as a whole. The Rule and the emissions reductions it requires are site-based rather than engine- or vehicle-based. *See* 42 U.S.C. § 7410(a)(5)(C) (requiring that an indirect source review program be a "facility-by-facility" review). It regulates an indirect source as a whole.

That Rule 9510 targets sites rather than equipment can also be seen by its scope of application. By its terms, the Rule's restrictions apply to certain kinds of *developments*, rather than to certain kinds of construction equipment. *See supra* p. 19535 & n.2. Whether the Rule's mandates reach certain construction equipment depends not on the character of construction equipment but the character of the site where the equipment happens to be located.

**[7]** Far from prohibiting Rule 9510, the plain language of section 110(a)(5) affirmatively authorizes it. A development site easily qualifies as "real property," or a "facility," "structure," or "installation." 42 U.S.C. § 7410(a)(5)(C). By measuring emissions by, and requiring emission reductions from, development sites as a whole, the Rule qualifies as a "facility-by-facility" review of indirect sources. *Id.* Finally, the Rule's clear purpose is "to assure, or assist in assuring" that these sites "will not attract" construction equipment that would con-

tribute to the exceedance of, or the failure to maintain, national air quality standards in the San Joaquin Valley.**[6]** *Id.* Rule 9510 is authorized by section 110(a)(5) of the Act.

### B.

Because the plain language of the Act's "indirect source review program" provision, section 110(a)(5), authorizes Rule 9510, we must cautiously examine the Act before we conclude that another of its provisions, section 209(e)(2), preempts Rule 9510. It would be odd if the Act took away from the states with one hand what it granted with the other. "[W]here possible, provisions of a statute should be read so as not to create a conflict." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370 (1986) (discussing the scope of preemption under the Communications Act of 1934).

**[8]** Preemption would be an especially strange result given the history of the Act. Congress added section 110(a)(5) to the Act in 1977 after the EPA had tried to force the states to regulate indirect sources of pollution. *See Manchester Envtl. Coal. v. EPA*, 612 F.2d 56, 57-58 (2d Cir. 1979). When the states had not regulated indirect sources to the EPA's satisfaction, the EPA began to promulgate its own rules for indirect sources. *Id.* at 58. The EPA's move "drew heavy criticism because [it] represented a significant federal intrusion into the traditionally local domain of land use control." *Id.* (citations omitted). In response to the EPA's actions, a 1977 amendment to the Act "severely limit[ed] the EPA's authority" over

---

**[6]**We note that the California Court of Appeal recently came to the same conclusion in parallel state litigation about Rule 9510. *Cal. Bldg. Indus. Ass'n v. San Joaquin Valley Air Pollution Control Dist.*, 100 Cal. Rptr. 3d 204 (Ct. App. 2009). The court concluded that the District had the authority to promulgate and enforce Rule 9510 under section 110(a)(5) and a state regulation that is materially indistinguishable from section 110(a)(5). *Id.* at 218. "The District's definition of 'indirect source,' " the court noted, "is not only reasonable but is also the only logical way to interpret the term." *Id.*

indirect sources, *id.*, but "left largely to the states" the matter of "whether and how to regulate" indirect sources, *Sierra Club v. Larson*, 2 F.3d 462, 467 (1st Cir. 1993). In light of the underlying purpose of section 110(a)(5) — to return power to states and localities — it would be surprising if the Act nevertheless preempted a local rule that qualified as an indirect source review program under section 110(a)(5).

### C.

Keeping in mind that Rule 9510 is a proper indirect source review program under section 110(a)(5), we proceed to examine the arguments NAHB makes, and the authorities it advances, in favor of preemption.

### 1.

NAHB contends that Rule 9510 establishes a "standard[ ]" within the meaning of section 209(e)(2) and is therefore preempted. It relies heavily on *South Coast*, a Supreme Court case concerning section 209(a) of the Act, which preempts states from adopting or attempting to enforce "any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). The question in *South Coast* was whether this provision preempted local rules requiring certain fleets of vehicles — street sweepers, airport taxicabs, and solid waste collection vehicles, among others — to purchase or lease certain low-emissions vehicles when adding or replacing vehicles in their fleets. *South Coast*, 541 U.S. at 249-51.

**[9]** Looking to the dictionary, the Court held that "standard" in section 209(a) meant "that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.' " *Id.* at 252-53 (quoting *Webster's Second New International Dictionary* 2455 (1945)). The *South Coast* district's six rules were standards within the meaning of section 209(a) because they required fleet operators to buy vehi-

cles with certain emissions characteristics. It did not matter that the rules were directed at purchasers rather than manufacturers. How a standard is enforced or complied with, *South Coast* held, is different from whether there is a standard at all. *Id.* at 253. A standard itself is simply that which requires a "vehicle or engine" not to "emit more than a certain amount of a given pollutant, . . . be equipped with a certain type of pollution-control device, or . . . have some other design feature related to the control of emissions." *Id.*

**[10]** NAHB argues that, like the rules in *South Coast*, Rule 9510 establishes a "standard[ ]," in this case, one "relating to the control of emissions" from construction equipment. 42 U.S.C. § 7543(e)(2)(A). It does not matter that a developer can comply with Rule 9510 in several different ways, because *South Coast* teaches that "the means of enforcing standards" should not be confused with whether or not a standard exists. 541 U.S. at 253. Rule 9510 is a standard simply because it requires construction equipment not to "emit more than a certain amount of a given pollutant." *Id.*

NAHB also appeals to *Pacific Merchant Shipping*, in which we held that section 209(e)(2) preempted California rules requiring the auxiliary diesel engines on certain ocean-going vessels not to emit more than a certain amount of pollutants. 517 F.3d at 1114-15.[7] In that case, we reasoned that the California rules were "standards" or "other requirements" because they "require[d] that engines 'not emit more than' the amount of [pollutants] they would emit if using the specified [low-sulfur] fuels." 517 F.3d at 1114 (quoting *South Coast*, 541 U.S. at 253). It did not matter that the rules allowed vessel operators to use certain fuels to meet the standard. Nor, says NAHB, should it matter here that developers can meet the mandates of rule 9510 through cleaner fuels or other alterna-

---

[7]The parties agreed that the regulated vessels qualified as nonroad vehicles under section 209(e)(2). 517 F.3d at 1113.

tive means. As in *South Coast*, "the means of compliance are irrelevant." *Id.* (citing *South Coast*, 541 U.S. at 253).

**[11]** Neither *South Coast* nor *Pacific Merchant Shipping* is on point. Both cases addressed rules that regulated emissions from vehicles. Rule 9510 does not target vehicles or engines. It targets emissions, and requires emissions reductions, from a development site as a whole. It does not require "a vehicle or engine" not to "emit more than a certain amount of a given pollutant," 541 U.S. at 253 — it requires a *development site* not to do so. In other words, the dispositive question is not whether Rule 9510 establishes a standard or other requirement. The question is whether it establishes a standard or other requirement "relating to the control of emissions from *[nonroad] vehicles or engines*," i.e., construction equipment. 42 U.S.C. § 7543(e)(2)(A) (emphasis added). Because Rule 9510 is targeted at a development site as a whole, its standard or requirement relates to emissions from an indirect source, not from nonroad vehicles or engines.

NAHB scorns this distinction, characterizing it as artificial and pointing out that the emissions from a development site during its construction phase come from construction equipment. But the distinction NAHB deprecates comes from the Clean Air Act itself. The Act, by allowing states to regulate indirect sources of pollution, necessarily contemplates imputing mobile sources of pollution to an indirect source as a whole. If an indirect source review program could not attribute the emissions from mobile sources, while they are stationed at an indirect source, to the indirect source as a whole, states could not adopt any indirect source review program. What allows Rule 9510 to qualify as an indirect source review program under section 110(a)(5) is precisely what allows the Rule to avoid preemption under section 209(e)(2): its site-based regulation of emissions. In this way, the two sections do

not conflict, but rather fit together neatly like two interlocking puzzle pieces.[8] *See La. Pub. Serv. Comm'n*, 476 U.S. at 370.

2.

Relying on a number of regulations, NAHB argues that section 209(e)(2) preempts states from regulating the emissions from groups of construction equipment just as much as it preempts state regulation of emissions from individual pieces of equipment. According to NAHB, Rule 9510 merely regulates groups of, rather than individual, vehicles and engines.

**[12]** Under its delegated power to adopt and enforce "*standards* applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines," 42 U.S.C. § 7521(a)(1) (emphasis added), the EPA has promulgated regulations that require manufacturers to produce vehicles that — on average — meet a particular emissions limit. *See, e.g.*, 40 C.F.R. § 86.1811-04(d). Thus a manufacturer may make one model that emits more pollutants than the "fleet-average" standard, but still complies with the standard because it makes another model that emits fewer pollutants than the fleet-average standard. If an emissions limit gauged by reference to a fleet of vehicles as a whole qualifies as a "standard," NAHB argues, then an emissions limit gauged by reference to the "fleet" of vehicles operating at a particular site is also a standard. In fact, the EPA itself has stated that section 209(e)(2) preempts states from enforcing their own fleet-average standards against *nonroad* vehicles

---

[8]Compare *South Coast*, which noted that section 246 of the Act, 42 U.S.C. § 7586, mandates purchase restrictions for fleet vehicles, but only "under *federal* standards designed precisely for *federally required* clean-fuel fleet vehicle programs — which programs, in turn, must be *federally approved* as meeting detailed *federal specifications*." 541 U.S. at 257. Section 110(a)(5), by contrast, is a grant of power to the states and does not require compliance with specific federal specifications. Perhaps most importantly, the district in *South Coast* did not defend its rules as being authorized by section 246. *Id.* at 254.

like construction equipment.[9] The fact that Rule 9510 regulates groups of construction equipment rather than individual vehicles or engines is therefore irrelevant.

**[13]** We agree that Rule 9510 escapes preemption not *merely* because Rule 9510 affects groups of construction equipment rather than individual engines or vehicles. An emissions limit calculated by reference to a fleet of engines or vehicles is as much a "standard" as an emissions limit calculated by reference to an individual engine or vehicle. Rather, Rule 9510 escapes preemption because its regulation of construction equipment is indirect. Rule 9510 does not measure emissions by fleets or groups of vehicles; it measures emissions on a "facility-by-facility" basis. 42 U.S.C. § 7410(a)(5)(D). Its unit of measurement is the indirect source, not the fleet. It regulates development sites directly, but as the term "indirect source" implies, it regulates mobile emissions only indirectly. For that reason, the fleet-based regulations are not analogous to Rule 9510.

## V.

**[14]** Rule 9510 is an indirect source review program that is not preempted by section 209(e) of the Clean Air Act. The district court's judgment is therefore affirmed.

**AFFIRMED.**

---

[9]*See* EPA, *Response to the Petition of American Road and Transportation Builders Association to Amend Regulations Regarding the Preemption of State Standards Regulating Emissions from Nonroad Engines* 14 (Aug. 21, 2008), Docket No. EPA-HQ-OAR-2004-0008-0921.

N.R. SMITH, Circuit Judge, concurring in part and dissenting in part:

Though I agree with the majority opinion that § 209(e)(1) of the Clean Air Act ("Act"), 42 U.S.C. § 7410 *et seq.*, does not preempt Rule 9510 promulgated by the San Joaquin Valley Unified Air Pollution Control District ("District"), I respectfully dissent from Parts IV and V. In my view, Rule 9510 is preempted by § 209(e)(2) of Act because (1) the regulation does not qualify as an "indirect source review program" under § 110(a)(5), since it directly regulates construction equipment (which are direct emissions sources); and (2) the regulation creates an emissions control "standard" for construction equipment that has not been approved by the Environmental Protection Agency ("EPA").

## I.

The Act authorizes states regulatory agencies to adopt local "implementation plans" to effectuate national air standards set by the EPA. *Id.* § 7410(a). As a general matter, states regulate stationary sources of pollution while the EPA regulates mobile sources of pollution. *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1078-80 (D.C. Cir. 1996).

Pursuant to § 110(a)(5) of the Act, the District adopted Rule 9510, which addresses "indirect sources" of pollution that do not fit clearly into the categories of stationary or mobile sources. *See Sierra Club v. Larson*, 2 F.3d 462, 467 (1st Cir. 1993). An "indirect source review program" is "the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution" that would contribute to the exceedance of national air quality standards. 42 U.S.C. § 7410(a)(5)(D).

The Act defines an "indirect source" as

a facility, building, structure, installation, real prop-
erty, road, or highway which attracts, or may attract,
mobile sources of pollution. Such term includes
parking lots, parking garages, and other facilities
subject to any measure for management of parking
supply . . . . *Direct emissions sources* or facilities at,
within, or associated with, any indirect source *shall
not be deemed indirect sources* for the purpose of
this paragraph.

*Id.* § 7410(a)(5)(C) (emphasis added).

Absent EPA approval, the District is prohibited from "ad-
opt[ing] and enforc[ing] standards and other requirements
relating to the control of emissions" from "any nonroad vehi-
cles or engines," other than certain new vehicles and engines
referred to in section 209(e)(1). 42 U.S.C. § 7543(e). Any
standard relating to the control of nonroad vehicle emissions
that the EPA has not authorized is impliedly preempted by
section 209(e)(2). *Pac. Merch. Shipping Ass'n v. Goldstene*,
517 F.3d 1108, 1113 (9th Cir. 2008).

As it relates to this case, Rule 9510 requires developers,
applying for certain construction permits, to create an "air
impact assessment" using an approved computer model to
determine how much Nitrous Oxide ("NOx") and particulate
matter under 10 microns in diameter ("PM10") the develop-
er's "construction equipment" would ordinarily produce. The
computer model measures the baseline level of emissions by
assessing the emissions that average California construction
equipment would emit if it were used to complete the devel-
opment.

From this baseline calculation, Rule 9510 requires that "ex-
haust emissions for construction equipment greater than [50]
horsepower used or associated with the development project"
be reduced by 20 percent for NOx emissions and by 45 per-
cent for PM10 emissions. If the developer cannot meet the

reductions, he must find alternative means of compliance or pay a fine.

## II.

Reasoning that Rule 9510 does not target direct sources apart from its regulation of a development site as a whole, the majority holds that the "plain language" of the Act affirmatively authorizes Rule 9510 as an "indirect source review program." Maj. Op. at 19545. I disagree.

Though an indirect source review program can certainly regulate direct emission sources *incident to* a broader regulatory scheme, Rule 9510 facially targets direct sources by limiting the emissions of construction equipment separate from its regulation of development sites. The "General Mitigation Requirements" under Rule 9510 provide separate NOx and PM10 emission reduction standards for (1) "*construction equipment* greater than fifty (50) horsepower used or associated with the development project" during construction, Rule 9510 § 6.1.1.1 (emphasis added); and (2) "*the project's* operational baseline" during ongoing operations, *id.* § 6.2 (emphasis added). Thus, Rule 9510 treats emissions from "construction equipment"—rather than all emissions from a development site as a whole—as the relevant unit of regulation during the initial phases of development.

Further, the Act unequivocally provides that "[d]irect emission sources . . . at, within, or associated with, any indirect source shall not be deemed indirect sources . . . ." 42 U.S.C. § 7410(a)(5)(C). If this provision has any meaning at all, it mandates that states cannot isolate direct emissions sources associated with an indirect source and deem them "indirect sources" subject to special regulation apart from the indirect source in the aggregate. Yet, this is precisely what Rule 9510 does—construction vehicles (direct emissions sources) are a subset of the "project" site (the indirect source). Construction vehicles do not fit the definition of an indirect source—"a

facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution," *id.*—so they cannot be regulated apart from the development project as a whole.[1]

The majority defends the Rule by arguing that the "baseline" and reduced emissions standards are calculated in terms of the development as a whole. But this ignores the fact that the reduced emissions standard is then imposed *exclusively* on "construction equipment"—not on the "site" or "development project." Regardless of how the standard is calculated, the Act plainly proscribes regulation of direct emission sources apart from indirect sources. The only part of Rule 9510 that applies an emissions standard to "the project," as a whole, is section 6.2, which regulates ongoing "project" emissions. But even if section 6.2, standing alone, could qualify as an indirect source review program, section 6.1.1.1 clearly does not.

Similarly, it makes no difference that the Rule applies only to "certain kinds of developments, rather than to certain kinds of construction equipment." Maj. Op. at 19544. There are no exceptions to 42 U.S.C. § 7410(a)(5)(C) in the Act for programs that limit the universe of regulatory possibilities to only certain kinds of development projects. The bottom line is that the exhaust emissions of construction equipment on a development site *that is* subject to Rule 9510 will be isolated and separately regulated in violation of § 7410(a)(5)(C)'s "direct emissions sources" proviso. I agree that a *development site*—in contrast to a fleet of construction equipment at a development site—qualifies as an indirect source under § 7410(a)(5)(C). But, by imposing emissions reduction standards separately on construction equipment located on that

---

[1] If Rule 9510 § 6.1.1.1 simply provided for the regulation of "the exhaust emissions *[from the development project]*," rather than from "construction equipment greater than fifty (50) horsepower used or associated with the development project," I would find no problem with the regulation.

site, Rule 9510 does exactly what the Act proscribes—regulate direct sources by deeming them indirect sources.

III.

The Act also preempts Rule 9510, because the Rule creates an emissions control "standard" that has not been approved by the EPA.[2] As the majority acknowledges, section 209(e)(2) creates a zone of implied preemption for "standards and other requirements relating to the control of emissions" from "any nonroad vehicles or engines." *Pacific Merchant*, 517 F.3d at 1113 (9th Cir. 2008).

In *Engine Manufacturers Ass'n v. South Coast Air Quality Management District*, 541 U.S. 246 (2004), the Supreme Court held that the Clean Air Act preempted a local rule requiring certain fleet operators—e.g., street sweepers, airport taxicabs, and solid waste collectors, among others—to purchase or lease designated low-emissions vehicles when adding or replacing vehicles in their fleets. 541 U.S. at 249-55. Since the federal government alone may establish specific emissions standards for particular vehicles, the local rule could not establish a "standard" requiring fleet operators to buy vehicles with certain emissions characteristics. The Court explained that a "standard," for purposes of the Act, is that which requires a "vehicle or engine" not to "emit more than a certain amount of a given pollutant, . . . be equipped with a certain type of pollution-control device, or . . . have some other design feature related to the control of emissions." *Id.* at 253. In *Pacific Merchant*, we later held that a California

---

[2]The EPA is currently reviewing Rule 9510, but has not yet taken final action to approve or disapprove the regulation. *See* Approval and Promulgation of Implementation Plans: 1-Hour Ozone Extreme Area Plan for San Joaquin Valley, CA, 74 Fed. Reg. 33,933, 33,937 tbl. 2 (July 14, 2009). A decision from the EPA would render our review unnecessary. As such, I would have preferred to allow that federal agency (tasked with managing indirect source review programs) to determine whether Rule 9510 comports with the relevant provisions of the Act before deciding this appeal.

regulation requiring marine vessels not to use auxiliary diesel engines "which emit levels of diesel PM, NOx, and SOx in exceedance of [specified] emission rates" established a "standard" under the definition articulated in *South Coast*. 517 F.3d at 1114 (internal quotations and alterations omitted).

No meaningful distinction exists between the regulations at issue in *South Coast* and *Pacific Merchant,* and Rule 9510. Like the regulation in *Pacific Merchant*, Rule 9510 fixes an ascertainable limit on vehicle or engine emissions. While the former required emissions "not to exceed [rates] . . . that would result had the engine used [certain specified] fuels," *Pacific Merchant*, 517 F.3d at 1112, (internal quotations omitted), the latter requires emissions not to exceed a rate calculated by subtracting certain reduction targets from the statewide average emissions rate.

Further, Rule 9510 requires emissions reductions specifically from *vehicles* or *engines* falling within their regulatory purview—not from a variety of emissions sources traditionally associated with "indirect sources."[3] Just as the regulation in *Pacific Merchant* affected any auxiliary diesel engine on an ocean-going vessel within twenty-four miles of California's coast, 517 F.3d at 1109, Rule 9510 specifically affects construction equipment over 50 horsepower located on or associated with a regulated development site. The majority ignores the plain language of Rule 9510 in concluding otherwise—in its view, the Rule "does not target vehicles or engines. It requires emissions reductions, from a development site as a whole." Maj. Op. at 19548. Yet, section 6.1.1.1 unequivocally

---

[3]I reiterate that "indirect sources" include facilities, structures, real property, roads, and even parking lots that attract mobile sources of pollution, but are not *themselves* mobile or direct emissions sources. 42 U.S.C. § 7410(a)(5)(C). While an indirect source such as a construction site would ordinarily include a variety of direct emissions sources—large and small nonroad construction equipment, temporary or permanent facilities, generators, road vehicles, etc.—the statute only provides for their regulation in the aggregate.

requires a reduction in "exhaust emissions for *construction equipment* . . . used or associated with [a] development project." The applicable unit of regulation here is the *fleet of vehicles* rather than the "site."

It makes no difference that the regulation in *Pacific Merchant* dealt with individual engines while Rule 9510 regulates fleets of vehicles. There are no limiting caveats in either *Pacific Merchant* or *South Coast* that would permit a state regulator to do to a small group of vehicles what it could not do to a single vehicle. Indeed, the regulation struck down in *South Coast* for establishing a "standard" under section 209 regulated *fleets* of vehicles.

Moreover, Rule 9510 effectively regulates construction vehicles individually. Since the permitted emission rate under section 6.1.1.1 is not divided among a variety emissions sources at the development site—as it would be had it targeted aggregate project emissions—this section of the Rule affects only "construction vehicles." Sections 6.1.1.1 and 6.1.1.2 then impose maximum emission standards calculated as a percentage of average construction emission rates in California. Because the estimation model accounts for "the *numbers* and *types* of construction equipment that will be used," the reduction standard necessarily affects every vehicle involved in the development project.

Lastly, the notion that states can regulate fleets of vehicles also runs afoul of the entire Clean Air Act regime. From the Act's inception, Congress has delegated regulation of stationary emissions sources to the states, while reserving (since the late 1960s) regulation of *mobile* emissions sources to federal province.[4] *Engine Mfrs. Ass'n*, 88 F.3d at 1079-80. Indeed,

---

[4]Only California is permitted to promulgate its own emissions standards for mobile sources under certain circumstances, but Rule 9510 was not promulgated pursuant to this authority. *See Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 n.26 (D.C. Cir. 1979).

Congress explicitly preempted state regulation of mobile emissions sources when "the possibility of 50 different state regulatory regimes 'raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers.' " *Motor & Equip. Mfrs*, 627 F.2d at 1109 (citation omitted).

Though Congress delegated additional regulatory authority to states over "indirect sources" that fit into neither the stationary nor mobile categories, *see Sierra Club*, 2 F.3d at 467, it did not upset its longstanding policy of setting only national standards for mobile emissions sources like construction equipment. Had Congress intended to delegate its authority to regulate mobile emitters, it could have said so. The Act defines "indirect sources" by their very propensity to "attract . . . mobile sources of pollution." Yet, nowhere do I find authority to regulate those mobile sources *directly*—that is, apart from an indirect source. Quite the contrary, Congress prohibited states from "adopt[ing] and enforc[ing] standards and other requirements relating to the control of emissions" from "*any nonroad vehicles or engines*," other than certain vehicles referred to in section 209(e)(1). 42 U.S.C. § 7543(e). It also exempted "direct sources" (a much broader category of emitters) from the purview of state indirect source review programs. *Id.* § 7410(a)(5)(C). Because large construction vehicles are both "nonroad vehicles" and "direct sources," Rule 9510 squarely contradicts the structure and express provisions of the Clean Air Act.